UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TRACIE POPE TOWNSEND,          )
                               )
    Plaintiff,           )
                               )
       v.               )    Case No. 3:13-CV-672-JD
                               )
CAROLYN W. COLVIN,             )
Acting Commissioner of Social Security,   )
                               )
    Defendant.           )

## OPINION AND ORDER

On July 3, 2013, Plaintiff Tracie Pope Townsend filed her Complaint in this Court

seeking review of the final decision of the Defendant Commissioner of Social Security

(Commissioner). [DE 1.] The Commissioner filed an Answer on January 31, 2014. [DE 7.] On

March 14, 2014, Townsend filed her opening brief [DE 10], to which the Commissioner

responded on June 20, 2014. [DE 16.] Townsend did not reply. Accordingly, the matter is now

ripe for decision. Jurisdiction is predicated on 42 U.S.C. § 405(g).

## I. Procedural History

Townsend filed an application for disability insurance benefits (DIB) on August 23, 2009

and supplemental security income (SSI) on October 6, 2009.[1] (Tr. 154-64.) Her applications

were denied initially on May 3, 2010, and again upon reconsideration on December 13, 2010.

(Tr. 84-92, 98-103.) On February 24, 2012, a hearing was held before Administrative Law

Judge Warnecke Miller (ALJ). (Tr. 47-75.) On March 22, 2012, the ALJ issued a decision

---

[1]The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 401.1501 *et. seq.*, while
the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the
applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case,
reference will only be made to the regulations applicable to DIB for clarity.

denying the claims. (Tr. 16-41.) The Appeals Council denied a request for review on May 8, 2013, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-6.).

## II. Facts

Townsend was born on June 1, 1968 and was 43 years old on the date the ALJ rendered his decision. (Tr. 154.) Townsend has completed the eleventh grade, obtained her GED, and earned several college credits. (Tr. 747, 757.) She has worked as an administrative assistant in a veterinarian office and an antique shop, although she essentially had no evidence of work activity from 2000 to 2004, and 2007 to the present. (Tr. 69, 170-172, 747-48.) Townsend grew up in an intact family of seven, but by the time of the hearing, her mother, father, and two of her brothers had passed away, one whom passed away in February 2006 and the other in November 2007. (Tr. 324, 746-47, 893.) In early 2009, she reportedly stopped working to care for her sick mother. (Tr. 768.) After the passing of her mother in April 2009, she lived with her father who was her primary care giver, until he passed away of a sudden heart attack on September 20, 2011. (Tr. 65, 898.) Thereafter, Townsend's sister began caring for Townsend on a daily basis. (Tr. 63-67.)

Townsend has been married twice but has no children. (Tr. 680, 746.) According to her medical report, her functioning started to decline in her early 30's, nearing the end of her second marriage when her drinking significantly increased. (Tr. 750-51, 56.) In this appeal, Townsend alleges a disability onset date of January 1, 2007 for mental impairments involving severe anxiety and depression, panic attacks, and bipolar disorder, while remaining insured through September 30, 2007 for purposes of DIB (Tr. 158, 183-191.)

The evidence establishes that Townsend has suffered from a long-standing history of alcohol abuse with intermittent improvement/relapses until October 2010 when she achieved

sobriety but thereafter became incredibly thin.[2]  Townsend and her treating physicians believe

that Townsend drank as a means of self-medicating for her anxiety and mental health issues.

Ultimately, the ALJ opined that absent Townsend's drug addiction and alcoholism (DAA) she

could perform limited sedentary work and therefore she was not disabled.

## A.    Townsend's Alcohol Dependence and Depression/Anxiety

Townsend's joint diagnosis of alcohol dependence and depression/anxiety are noted

throughout the record. (Tr. 262, 294, 324, 330, 355, 386, 402, 422, 442, 474, 486, 615, 620, 625,

630, 636, 644, 673, 675, 688, 693, 698, 735, 749, 759, 818, 824, 845, 894, 899.) There are few

occurrences in the record where Townsend was not diagnosed with both alcohol dependence and

depression/anxiety. (Tr. 255-256, 305, 343, 567.)

Townsend's extensive history of hospitalizations in 2006, 2009, and 2010 are also

reflected in the record. (Tr. 255-291, 292-303, 304, 309, 324, 342, 355, 384, 400, 419, 442-43,

486-87, 544, 561, 632, 674, 676.)  In 2009 through 2011, she was also under the care of the

Center for Behavioral Medicine and Oaklawn Psychiatric Center. (Tr. 612-631, 670-699, 783-

824, 827-881, 887, 889, 892-910.)

Dr. Jarvis was extensively involved in Townsend's treatment.  In November 2006 and

June 2009, Dr. Jarvis noted her various hospitalizations since 2004. (Tr. 324, 332, 324, 360-61.)

He also indicated his realization that Townsend had not remained sober as often claimed. *Id*.  In

June 2009, Dr. Jarvis wrote a detailed report, noting that Townsend was well known to his

practice and had been his patient for five to six years at that point. (Tr. 360-62.) He explained

[2]The Court has reviewed the entire administrative record in this case.  However, given the sensitive nature of
Townsend's medical history and the fact that the parties do not dispute the contents of the medical records (which
reveal Townsend's extensive history and treatment for psychological impairments and alcohol abuse with relapses
until October 2010), the Court has provided only the necessary details of these records.

that she has a combination of issues, which consisted of generalized anxiety disorder with limited symptom panic attacks, depressive disorder, bereavement, avoidant personality features, and alcohol dependence which is "episodic" and severe. Dr. Jarvis pointed to a "cascade of losses" that were causing her current presentation, pointing out the death of her mother, brother, pet dog, and the significant evolving illness of her father. (Tr. 360.) Townsend then agreed to transition to Oaklawn Psychiatric Center for rehabilitation which occurred on August 2, 2009. (Tr. 487, 561.)

By August 9, 2009, Townsend started going to two alcoholics anonymous (AA) meetings a week and had a sponsor, although according to Oaklawn's record she began struggling with increased anxiety and weight loss. (Tr. 615.) By August 23, 2009, she had been sober for almost thirty days and increased her AA meetings to three times per week. (Tr. 620.) Although the report stated that her anxiety was still bothersome, she had been able to gain one pound and her sleep improved. (Tr. 620.) By October 15, 2009, Townsend reported that she had finished step two in the AA program. (Tr. 624.) The report still showed that she had increased anxiety, and attributed it to an upcoming court date. (Tr. 624.) On November 12, 2009, she discussed her sobriety, was described as upbeat, and reportedly felt stronger since gaining five pounds. (Tr. 629-31.) On January 7, 2010, Townsend reportedly graduated from Oaklawn's domiciliary intensive outpatient program, completing five months of sobriety. (Tr. 697.)

Unfortunately, one month later, on February 6, 2010, Townsend relapsed nearing the anniversary date of her brother's death. (Tr. 632, 636, 643.) Oaklawn's clinical nurse specialist and medical doctor indicated that "triggers to relapse (trauma), and coping" were discussed. (Tr. 694.) A February 21, 2010 report, made by a medical doctor at Oaklawn, described Townsend's behavior as self-medicating after being depressed about recent family deaths. (Tr. 676.) Both

Dr. Jarvis at the Center for Behavioral Medicine and Dr. Matthews at Oaklawn recommended that Townsend be hospitalized for long-term treatment. (Tr. 744-45.) And on March 17, 2010, Townsend was released by Oaklawn and committed to Richmond State Hospital for sustained intensive treatment of her alcohol dependence and mood and anxiety disorders. (Tr. 671-674.) While committed, Townsend was described as a "hopeful, positive person making progress towards recovery." (Tr. 731.) On June 9, 2010, she was transferred from Richmond to the Oaklawn Transitional Group Home. (Tr. 731.)

By June 29, 2010, Townsend was attending AA meetings twice per week, appeared calm, and denied problems with anxiety. (Tr. 802, 805.) At the time, psychiatrist Lois Elaine Duryea, D.O., opined that Townsend was incapable of gainful employment due to her psychiatric illness. (Tr. 783.)

On August 5, 2010, during her treatment at Oaklawn, Townsend reported that she found a small AA group and asked for permission to only attend that group, which met once per week. (Tr. 811.) She reported being anxious in a group of more than five people, but was able to go to the grocery store with family and did not appear anxious in the waiting room of about twenty people. (Tr. 811.) On September 9, 2010, the report states that she was anxious and had trouble relaxing. (Tr. 817.) On October 21, 2010, she was described as pleasant and cooperative, saying that she liked going to her AA meetings and was looking forward to the holidays. (Tr. 823.) On December 16, 2010, she had remained sober and said that she liked going to AA meetings. (Tr. 841, 844.)

## B.     The State Agents' Assessments

On April 30, 2010, the state consultative examiner William Schirado, Ph.D., completed a psychiatric review technique and indicated that his first assessment was from January 1, 2007

(the onset date) to September 30, 2007 (the date last insured), while his second assessment continued from onset to August 28, 2009. (Tr. 700-727.)  Townsend was noted as suffering from "coexisting nonmental impairment(s) that requires referral to another medical specialty." Townsend was not categorized as having any mental disorders until the second assessment which indicated she suffered from substance addiction disorder resulting in induced mood disorder, without which she would not have a medically determinable mental impairment.  It appears that Schirado believed Townsend had no functional limitations, but the form was not filled in.  On December 8, 2010, reviewing state agent William Shipley, Ph.D, affirmed Schirado's assessment. (Tr. 825.)

On May 3, 2010, state agent Cheryl Bruzewski concluded that physically, Townsend's primary condition was alcoholism, and that the only difficulties she would have were with lifting, squatting, bending, standing, walking, kneeling, and stair climbing, along with difficulties with memory and concentration, but not with instruction. (Tr. 728.)  On December 11, 2010, reviewing state agent J. Sands, M.D. affirmed Bruzewski's assessment. (Tr. 826.)

## C.    Townsend's Malnourishment

As of late October 2010, it appears Townsend stopped drinking, but she began dropping weight.  Measuring five feet, eight inches tall (Tr. 683), her reported weight and body mass index (BMI) since September 2010 were as follows:

| Date | Weight | Page | Calculated BMI |
|------|--------|------|----------------|
| 9/9/10 | 116 | 855 | 17.6 |
| 10/21/10 | 111 | 823 and 850 | 16.9 |
| 12/16/10 | 109 | 844 and 904 | 16.6 |
| 5/12/11 | 94 | 903 | 14.3 |
| 8/4/11 | 87 | 896, 899, 900 | 13.2 |
| 12/1/11 | 90 | 893 | 13.7 |
| 12/16/11 | 87 | 919 | 13.2 |

| 12/23/11 | 87 | 918 | 13.2 |
| 1/6/12 | 84 | 916 | 12.8 |
| 1/20/12 | 92 | 914 | 14 |

Townsend was frequently described by doctors as "under-nourished." (Tr. 731, 733, 735, 737, 739, 750, 755, 759, 763, 894.) One doctor suggested she may have "hyperthyroidism." (Tr. 760.) And on several occasions, doctors wondered if she was suffering from bulimia or anorexia nervosa. (Tr. 755, 750, 760.) On August 4, 2011, she was urged to see a doctor for her weight problems, but she reportedly did not see a doctor because she had no insurance. (Tr. 899, 900.)

It was noted that Townsend was admitted to Elkhart General Hospital from November 17-21, 2011 complaining of extensive weight loss and inability to eat on account of chronic pancreatitis. (Tr. 890-891.) Noted were Townsend's ongoing mental issues of mood disorder, anxiety disorder, alcohol/sedative/hypnotic dependence in full remission. It was documented that the option of nursing home placement was discussed with Townsend and her family, but they declined such placement. She was discharged on various medications and diagnosed as having a urinary tract infection, dehydration, protein calorie malnutrition, hyponatremia (low blood sodium), hyperkalemia (high blood potassium), and psychiatric illnesses.

By December 16, 2011, she had been hospitalized twice for severe weight loss. (Tr. 919.) She was again diagnosed with malnutrition on April 3, 2012. (Tr. 920.) Throughout the record, she generally complained that she "can't digest food." (Tr. 879, 904.) Also, doctors noted her weight loss and described her as looking gaunt. (Tr. 841, 844.) She reportedly drank two Ensures per day in an effort to gain weight. (Tr. 899.)

**D.      Recent Treating Medical Provider Letters**

On January 31, 2011, Dr. Jarvis wrote Townsend's attorney a letter explaining that he has intermittently treated Townsend from March 2004 through June 2009, and it was his opinion that Townsend suffered from debilitating anxiety disorder and recurrent major depression with avoidant personality characteristics. (Tr. 882.) He reported that at least 10 of her inpatient psychiatric hospitalizations during his treatment were for severe suicidality with attempts to take her life, in the face of "debilitating anxiety and secondary episodic alcohol abuse." He noted that she has deteriorated over the last several years due to a number of psychological stressors, particularly the deaths of her brother and mother and her divorce. He indicated that she requires significant anti-anxiety and antidepressant medication and poorly tolerates social interface and the stressors of an occupational environment. In his opinion, "Townsend's underlying Anxiety Disorder is <u>not</u> directly related to alcohol, or its use. Alcohol abuse is felt to arise from attempt to self-medicate her Anxiety." (Tr. 882) (emphasis included).

On March 14 and December 22, 2011, Psychiatrist Duryea wrote Townsend's attorney letters indicating Townsend has been a patient at Oaklawn since August 2009, with Duryea becoming her outpatient psychiatrist in June 2010. (Tr. 887, 889.) Duryea diagnosed Townsend with bipolar disorder (NOS), anxiety disorder (NOS), alcohol dependence in remission, sedative, hypnotic, anxiolytic dependence in remission, and personality disorder (NOS). After the loss of her father, Townsend became "more down and more paranoid." She noted that Townsend was dependent on her family to bring her to her appointments, and that she has a long term serious mental illness preventing her from engaging in full time competitive employment, and that the illness was expected to be life long.

On April 3, 2012, Dr. Robert Abel, M.D., indicated that he has been treating Townsend for the past year for her "very difficult chronic problem with severe malnutrition." (Tr. 920). It was noted that she was down to 87 pounds and had severe weakness from her malnutrition. He noted that many tests and medications have not helped, and there was "no way" Townsend could work.

**E.      Townsend and Her Sister's Testimony**

Townsend, represented by counsel, testified at her hearing, as did Townsend's sister, Elizabeth Pope. (Tr. 49-67.) Townsend testified to having received her GED in 2004 and having previously worked as an administrative office assistant from 1998-1999 and 2005-2006. She indicated that she currently weighed 83 pounds, and was unable to work on account of her anxiety disorder, confusion, and inability to handle stress, along with the fact that she previously drank heavily. She explained that her anxiety makes her feel nervous and weak, to the point where she can't finish tasks. Townsend indicated that she has sought psychiatric care since 2004.

On an average day in 2007, Townsend indicated that she had bad anxiety, drank heavily, and didn't "do very much at all." Townsend stated that she has always had anxiety and panic attacks, which now occur three to four times a week. Townsend also testified that regardless of whether she was drinking, her family has had to care for her and she no longer cooks or cleans due to her nerves. Townsend indicated that she is always sick to her stomach, she has difficultly eating, and she is really weak. She takes Phenergan for her nausea. Although she did go out to lunch occasionally before her dad passed away, she has a fear of being in public and has not gone out in a long time. She has regularly attended AA meetings in the past, but wasn't doing so in early 2012. Townsend indicated she thought she had been sober since October 2010.

Elizabeth Pope testified (Tr. 63-67) to taking care of Townsend on a daily basis, including making her shower at least once a weak and helping her wash and comb her hair.  Ms. Pope indicated that Townsend could absolutely not function independently, and Townsend does not go out of the house without Ms. Pope being with her.

Ms. Pope explained her observations of Townsend's panic attacks which occur about two or three times a week, and last about twenty minutes with the residual effects lasting for hours.  Ms. Pope indicated that Townsend has severe pain in her chest, can't breathe, and becomes scared to death.  Townsend cannot be rationalized with, and her medication doesn't work to keep her from having the attacks.

Ms. Pope explained that in her opinion Townsend has been unable to deal with all of the deaths in her family, and at Townsend's last hospital visit in November 2011, Townsend only weighed 76 pounds, had chronic nausea and pancreatic pain, and the medical staff told Ms. Pope to put Townsend in a nursing home to live out her last days.  Ms. Pope said she is desperately trying to save her sister by making her eat and go to the doctor on a weekly basis, which has resulted in her going "back up" to about 84 pounds.

**F.    The Vocational Expert's Testimony**

The Vocational Expert, Sharon Ringenberg (VE), testified that she had reviewed Townsend's work records and was present during the hearing testimony.  The VE indicated that Townsend's past work as an office manager/general office clerk was a semi-skilled job that was performed at the sedentary exertional level.  The ALJ then asked the VE what work Townsend could perform under the following "set of hypothetical limitations": Occasional lifting/carrying of ten pounds with frequent lifting/carrying of five pounds; standing/walking two hours and sitting six hours out of an eight hour workday; occasional climbing of ramps or stairs, but no

climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching and crawling; avoidance of hazards (i.e. moving machinery, unprotected heights and slippery/uneven surfaces); inability to understand, remember, or carry out detailed instructions; limited to only redundant tasks that did not require frequent decision making and no sudden or unpredictable work place changes; and, no more than superficial interaction with the public, supervisors, or co-workers (meaning that successful performance of the job duties involved working primarily with things and not people, although incidental interaction or proximity would be tolerated).  Based on this first hypothetical set of limitations, the VE indicated that Townsend could not perform her past work, but she could perform sedentary work as an addresser, a telephone order clerk, and a table worker.

With respect to the second hypothetical individual, the ALJ asked the VE what work Townsend could perform with the following specified limitations: No climbing of ladders, ropes, or scaffolds with only occasional balancing; avoidance of hazards (i.e. moving machinery, unprotected heights and slippery/uneven surfaces); inability to understand, remember, or carry out detailed instructions or perform tasks requiring focused attention for more than fifteen minutes continuously; no more than superficial interaction with the public, supervisors, or co-workers (meaning that successful performance of the job duties involved working primarily with things and not people, although incidental interaction or proximity would be tolerated); and expected to have four or more unscheduled absences per month on a consistent basis.  "Given this set of limitations" the VE indicated that Townsend could not perform her past work or other work.  The VE clarified that in general, missing two or more days a month consistently would result in the inability to maintain competitive employment.  Further, an individual must remain

on task about 80 to 85% of the time, which takes into consideration normal breaks, plus being off task an additional two to five minutes per hour.

## G.      The ALJ's Opinion

In rendering his disability determination, the ALJ found that Townsend had severe impairments, which were bipolar/anxiety/personality disorders and alcohol/sedative/hypnotic/anxiolytic dependence. (Tr. 22.) But he found that these impairments, or combination of impairments, did not meet or equal a Listing. (Tr. 22.) Based on these impairments, the ALJ found that Townsend had the residual functional capacity (RFC)[3] to perform a full range of work at all exertional levels with limitations that were consistent with the ALJ's second hypothetical posed to the VE.  And, consistent with the VE's response to the second hypothetical question, Townsend was deemed unable to work. (Tr. 31.)  But because there was medical evidence of a substance use disorder, the ALJ was required to determine whether the substance use disorder was a contributing factor material to the determination of disability. 20 C.F.R. §§ 404.1535, 416.935. In making this determination, the ALJ was required to decide whether Townsend would still be disabled if she stopped using drugs or alcohol—a decision to be made by evaluating whether the physical and mental limitations that would remain absent DAA would still result in disability. *Id*.  If the remaining limitations are disabling, then Townsend would be deemed disabled, and vice versa.

Given this obligation, the ALJ explained that if Townsend stopped the substance abuse, he believed she would continue to have severe impairments with respect to her remaining mental health conditions and significant weight loss marked by low BMI and weakness. (Tr. 32.)

---

[3]Residual functioning capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting.  20 C.F.R. § 404.1545(a)(1).

However, the ALJ determined that these impairments were not of Listing level severity. (Tr. 32.) The ALJ found that absent the substance abuse, Townsend would have the RFC to perform sedentary work with additional limitations which were consistent with the first hypothetical that the ALJ presented to the VE. And similar to the VE's testimony, the ALJ found that given Townsend's believed RFC absent substance abuse, Townsend could not perform her previous work, but she could perform work as an addresser, telephone order clerk, and table worker. As a result, the ALJ found that Townsend was not disabled within the meaning of the Social Security Act at any time from the alleged onset date. (Tr. 40.)

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, this Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v.*

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id*. An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Furthermore, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2.  Whether the claimant has a medically severe impairment;

3.  Whether the claimant's impairment meets or equals one listed in the

regulations;

4.  Whether the claimant can still perform relevant past work; and

5.  Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ determines

that the claimant's impairment or combination of impairments meets or equals an impairment

listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. §

404.1520(a)(4)(iii). However, if a listing is not met or equaled, in between steps three and four,

the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the

claimant can perform his past work under step four and whether the claimant can perform other

work in society at step five of the analysis. 20 C.F.R. § 404.1520(e). In this case, the ALJ also

had to evaluate whether the physical and mental limitations that would remain absent DAA

would still result in disability. 20 C.F.R. §§ 404.1535, 416.935. The claimant has the initial

burden of proof in steps one through four, while the burden shifts to the Commissioner in step

five to show that there are a significant number of jobs in the national economy that the claimant

is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Townsend challenges the ALJ's RFC determination absent any DAA, as well as the

ALJ's failure to adequately consider Townsend's malnutrition under the Listings.

A.      **RFC and Materiality of DAA**

"The RFC is an assessment of what work-related activities the claimant can perform

despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); *see also* 20

C.F.R. § 404.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into

consideration all of the relevant evidence, including both medical and non-medical evidence, *see* 20 C.F.R. § 404.1545(a)(3), and he is required to determine which treating and examining doctors opinions should receive weight and must explain the reasons for these findings. 20 C.F.R. § 404.1527(c). If an ALJ rejects all record opinions indicating limitations, the "evidentiary deficit" that leaves cannot be filled by the ALJ based on his lay opinion of RFC. *See Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010).

The RFC assessment in this case is made complicated by Townsend's history of alcohol and drug dependence. Alcoholism or drug addiction cannot be a basis for obtaining social security benefits: "[A]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." *See* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); *see also* 20 C.F.R. §§ 404.1535, 416.935. In other words the inquiry for the ALJ is whether "were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628–29 (7th Cir. 2006) (citations omitted).

In this case, the ALJ inferred from the improvement in Townsend's functioning after she became sober in October 2010 (the date accepted by the ALJ), that she could still perform work at the sedentary level despite her remaining mental health limitations and significant weight loss. But in so concluding, the ALJ rejected the only medical testimony that had considered Townsend's condition after actually having become sober (as detailed below), and then the ALJ filled the evidentiary gap with his own assessment; in essence, he "played doctor". *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (insisting "that an ALJ must not substitute his own judgment for a physicians's opinion without relying on other medical evidence or authority in the record"). Thus, even assuming the claimant bears the burden of proving that alcoholism or

16

drug addiction is not a contributing factor,[4] remand is required because as discussed below the ALJ's disability determination absent DAA is insufficiently supported.

In finding that absent DAA Townsend was capable of performing work, the ALJ rejected the medical opinions from treating medical providers Dr. Jarvis, Psychiatrist Duryea, and Dr. Abel who collectively indicated in 2011 and 2012 that Townsend's debilitating anxiety and chronic, severe malnutrition rendered Townsend unable to work. Even assuming that these opinions did not deserve greater weight (given the ALJ's thorough analysis of Townsend's medical evidence and the extensive reasoning for the weight afforded it), the evidentiary deficit left by the ALJ's rejection of these medical opinions cannot be overlooked. Simply put, there where no other medical opinions providing a functional assessment of Townsend's abilities subsequent to her significant weight loss, once Townsend's sobriety was finally maintained in late 2010.

Specifically, Townsend's medical records establish that she has a long-standing history of alcohol abuse with intermittent improvement/relapses, but once she finally established a long stretch of sobriety, she continued to lose weight. Prior to Townsend's significant and ongoing weight loss in 2011, the record provided a glimpse of what occurs to Townsend upon establishing sobriety. For instance, when Townsend was admitted to Oaklawn for about one month (between February 20 and March 17, 2010), Townsend lost 10 pounds while in inpatient treatment. Townsend was then transferred to Richmond State Hospital on March 17, and it wasn't until her discharge that Townsend had gained 10 pounds back by August 2010. And

---

[4]*Harlin v. Astrue,* 424 F. App'x 564, 567 (7th Cir. 2011) (claimant bears the burden); *but see Mikolajczyk v. Colvin*, No. 2:12-CV-86-PRC, 2013 WL 5460156 (N.D. Ind. Sept. 30, 2013) (without deciding the issue, listing cases evidencing a conflict on who bears the burden).

during this period of weight gain, it was suspected that Townsend had started drinking again—a sentiment the ALJ shared. On October 21, 2010, the date the ALJ believed Townsend actually quit drinking, Townsend reported weighing 111 pounds, which Townsend indicated was her normal weight.

As Townsend's sobriety was sustained, her weight continued to drop beyond what was normal for her. On December 16, 2010, Townsend, who again was five foot and eight inches tall, weighed 109 pounds, and reached a BMI of 16.6. By May 2011, she was down 15 more pounds, and by August 2011, she weighed only 87 pounds. While Oaklawn treatment records indicate she was psychiatrically stable, it was also noted that she was very underweight and appeared tired, and continued to have poor coping skills. In addition, she had not driven in almost four years because driving made her too anxious. In November 2011, she was admitted to the hospital for 5 days on account of malnourishment and psychiatric illnesses. She was again hospitalized in December 2011, due to weight loss and an inability to eat (because it made her sick to do so). By the beginning of 2012, Townsend had lost almost 30 pounds since October 2010, and she was noted as being "still very weak" and "frail." Also in early 2012, Townsend's sister indicated that she was desperately trying to save her sister by making her eat and go to the doctor, and that taking care of Townsend was like taking care of a five year old.

Despite evidence of Townsend's continued loss of weight and strength while maintaining sobriety into 2011, the ALJ gave "greater weight" to the opinions of the state agency physicians and psychologists who opined that absent Townsend's DAA, she did not suffer any medically determinable impairment or significant functional limitations. The ALJ indicated that the agency determinations were more consistent with the evidence, unlike the testimony and allegations of total disability. But the state agent opinions were rendered in April and May 2010

18

(and reviewed by other state agents in early December 2010), prior to Townsend's sustained sobriety and abnormal weight loss.

Thus, the problem with the ALJ's analysis is two-fold:

First, the state agents could not have ever reviewed Townsend's post-December 11, 2010 records, and therefore they never knew about Townsend's abnormal weight loss and inability to regain the weight, along with resulting weakness, once she sustained sobriety. Clearly, these records provided significant substantive evidence of Townsend's further physical and mental impairments as detailed, and an opinion rendered without their consideration was simply not reliable. *See Staggs v. Astrue*, 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided significant substantive evidence regarding the claimant's medical impairments and that any medical opinion rendered without taking this subsequent record into consideration was incomplete and ineffective).

Second, after discounting the only medical providers who rendered opinions after December 2010 (indicating that Townsend was unable to physically and mentally maintain competitive employment), the ALJ had no medical opinions that provided a functional assessment of Townsend's abilities subsequent to her ongoing weight loss which coincided with her sobriety. Although the 2011 treatment notes from Oaklawn do indicate that Townsend showed some improvement in her mood, they certainly provided no functional assessment of Townsend's abilities, nor did they offer an opinion about the limitations that Townsend's physical and mental impairments may have caused.

Despite this, the ALJ projected that given ongoing treatment, it could be reasonably expected that Townsend would improve, her condition would not be expected to endure 12 months, and despite reports of weakness from weight loss, Townsend was capable of performing

sedentary work which "may" (per the ALJ) result in various exertional and nonexertional limitations. But again, there were no medical records that could possibly support the parameters arbitrarily included in the ALJ's RFC determination. It is unclear, therefore, how the ALJ concluded that absent DAA, Townsend was capable of working.

Thus, in denying benefits, the ALJ failed to build an accurate and logical bridge from the evidence to his conclusion, *Clifford*, 227 F.3d at 872, and impermissibly "played doctor" by using his own lay opinions to fill evidentiary gaps in the record. *See, e.g., Blakes v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). Under the circumstances, the ALJ should have called an expert to provide an informed basis for determining Townsend's RFC absent DAA. 20 C.F.R. § 404.1527(e)(2)(iii), 416.927(e)(2)(iii); *See Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (remanding where the ALJ ignored a new medical issue but should have sought more information); *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007) (remanding where the ALJ failed to obtain additional records needed for the medical expert to provide a full and fair evaluation of the impairments). The ALJ's RFC assessment absent DAA is not supported by substantial evidence, and thus remand is required in order for the ALJ to provide adequate support for the determination of whether Townsend's DAA was material to the disability determination.[5]

---

[5]One year after the ALJ issued his decision, the Commissioner amended the policy regarding substance use as a contributing factor. SSR 13-02p. With regard to co-occurring mental disorders, there must be "evidence in the case record that establishes that a claimant with a co-occurring mental disorder(s) would not be disabled in the absence of DAA" to support a finding that DAA is material; the ALJ cannot "rely exclusively on medical expertise and the nature of a claimant's mental disorder." SSR 13–02p. In addition, "[The Commissioner] will find that DAA is not material to the determination of disability and allow the claim if the record is fully developed and the evidence . . . does not establish that the claimant's . . . [mental or physical impairments] would improve to the point of nondisability in the absence of DAA." *Id.* Such rule is now binding on the Commissioner. *Lauer v. Apfel,* 169 F.3d 489, 492 (7th Cir. 1999) (citing 20 C.F.R. § 402.35(b)(1)).

And for the purpose of remand, the ALJ shall also specifically indicate whether he believed Townsend and her sister's testimony concerning her weekly anxiety attacks. While the ALJ discredited various parts of their testimony for a variety of reasons, the ALJ did not specifically indicate the extent to which he believed Townsend suffered from three to four panic attacks a week, each lasting up to twenty minutes with residual effects lasting several hours. Townsend's medical records also indicate she suffered these attacks before October 2010. So even if the ALJ thought Townsend suffered fewer anxiety attacks with more fleeting effects than the testimony suggested, the actual time Townsend would be off task (or even miss work altogether) due to her anxiety must be considered for purposes of determining Townsend's RFC. SSR 96–8p; 20 C.F.R. § 404.1529(a) (in making a disability determination, the ALJ must consider a claimant's statements about her symptoms and how those symptoms affect her daily life and ability to work). Thus, on remand, the ALJ must determine Townsend's RFC after explaining the credibility of her limiting effects caused by her anxiety attacks.

**B.      The Listings**

The Court comments on a remaining issue that will affect the handling of the case on remand. As Townsend asserts, the ALJ did not adequately explain why Townsend failed to meet Listing 5.08 given her recurrent severe weight loss. The Commissioner argues that the ALJ thoroughly explained that she did not meet the criteria for this Listing because there was a lack of evidence that Townsend had a digestive disorder or that she underwent treatment.

To meet Listing 5.08, one must suffer "[w]eight loss due to any digestive disorder despite continuing treatment as prescribed, with BMI of less than 17.50 calculated on at least two evaluations at least 60 days apart within a consecutive 6-month period." 20 C.F.R. § Pt. 404,

Subpt. P, App. 1 § 5.08.  The regulation also states that "[d]isorders of the digestive system include . . . malnutrition."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 5.00.

There is no dispute that Townsend has experienced recurrent weight loss and has been consistently underweight.  Nor is there any dispute that she has had a BMI of less than 17.50 on at least two evaluations at least 60 days apart within a consecutive 6-month period.  The issue at hand is essentially whether Townsend met the Listing requirements that she have "a digestive disorder despite continuing treatment."

The ALJ concluded that Townsend does not meet the Listing, stating:

> *Absent evidence of continuing related treatment as prescribed*, and as required by Listing 5.08, and given the potential for multiple other causes for weight loss, the claimant cannot be found to meet this Listing *due to a digestive condition*.  The ALJ acknowledges the amount of weight is clearly consistent with that contemplated by Listing 5.08, and has been for what appears to be more than one year.  However, *the ALJ cannot assume the role of physician, and absent specific supportive evidence, cannot rule weight loss is specifically attributable to a digestive disorder of any type*. (Tr. 38) (emphasis added).

However, Townsend was formally diagnosed with severe malnutrition, and the regulations state that disorders of the digestive system include malnutrition. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 5.00.  Moreover, according to the regulations, even if Townsend did not receive treatment sufficient to meet the criteria of one of the digestive system listings, her "digestive impairment may medically equal a listing." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 5.00(C)(6).  And to make such a determination, an expert would need to be consulted. *See* SSR 96-6p ("An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made.").  Thus, on remand the ALJ shall provide further explanation, and if necessary seek an

updated medical expert opinion on the question of medical equivalence, for the purpose of Townsend's meeting Listing 5.08.

## V.  Conclusion

For the foregoing reasons, the Court GRANTS Tracie Pope Townsend's request to remand the ALJ's decision [DE 1].  Accordingly, the Court now REMANDS this case to the Commissioner for further proceedings consistent with this Opinion and Order.

SO ORDERED.

ENTERED: February 5, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court